UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALIGN TECHNOLOGY, INC.,

          Plaintiff,

   v.

STRAUSS DIAMOND INSTRUMENTS, INC.,

          Defendant.

Case No. 18-cv-06663-TSH

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. No. 21

## I. INTRODUCTION

Plaintiff Align Technology, Inc., seeks to enjoin Defendant Strauss Diamond Instruments, Inc., from advertising for sale, offering for sale, or selling its dental imaging wand sleeve product (MagicSleeve), or any other product for use with Align's dental imaging (iTero) scanner system or other Align products, and from using the iTero and Invisalign marks and any similarly confusing marks. Mot. at 24. Align filed a Motion for Preliminary Injunction ("Mot.") on January 24, 2019. ECF No. 21. Strauss filed its opposition on February 14, 2019. Opposition to Motion for Preliminary Injunction ("Opp. to Mot."), ECF No. 43. Align filed its reply on February 28, 2019 and attached an additional declaration. Reply to Opposition ("Reply to Opp."), ECF No. 57. Strauss responded with an objection to the addition of the declaration in Align's reply. ECF No. 61. Align filed a supplemental declaration on March 11, 2019. ECF No. 65. The Court held a hearing on the matter on March 14, 2019. Having reviewed the parties' positions, the evidence submitted, and relevant legal authority, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Align's motion for the following reasons.

///

///

United States District Court
Northern District of California

## II. BACKGROUND

**A. Align**

One of Align's products is the well-known Invisalign system. Avi Kopelman Declaration ("Kopelman Decl."), ¶ 4, ECF No 23-4. Invisalign straightens teeth using clear, removable plastic trays. *Id.*

### 1. iTero Element

Align also makes and sells the iTero Element scanner. Kopelman Decl., ¶ 5. There are currently three models of the iTero scanner: the iTero Element, the iTero Element 2, and the iTero Element Flex (collectively the "iTero Element scanner"). *Id.* The scanner is a handheld intraoral scanner system that is used to take three dimensional scans of a patient's mouth, teeth and gums. The scans are used in preparing the trays for the Invisalign system. *Id.* ¶ 7. The digital images produced by the iTero Element scanner are a major improvement over the prior methods of taking physical impressions which can be messy and uncomfortable for patients. *Id.* ¶ 8. The 3D scans created by the iTero Element scanner are more efficient, more precise and more comfortable for patients. *Id.* They also substantially reduce the rate of restoration "remakes" so that patients are recalled less often. *Id.* ¶ 9. Additionally, the appointment time for the digital scan is shorter because of fewer adjustments, which results in greater patient satisfaction. *Id.* ¶ 10.

The iTero Element scanner includes a computer system with an attached "wand," which collects thousands of images per second as dental practitioners use it to scan a patient's mouth. *Id.* ¶ 11. The proprietary software of the iTero Element scanner then produces a precise, high-resolution, color 3D model of the patient's teeth and gums. *Id.* ¶ 12.

The iTero Element scanner includes a protective sleeve that slides over and covers the portion of the scanning wand that is inserted into the patient's mouth. *Id.* ¶ 13. Align's sleeve is disposable and single-use only, thereby protecting patients from, among other things, cross-contamination. *Id.* ¶ 14.

The iTero Element sleeve includes a window opening that has a piece of glass with antireflective coating, among other specialized coatings, to optimize the quality of the 3D scan. *Id.* ¶ 15. The sleeve and this window incorporate a proprietary design developed to ensure that

scans with the iTero Element scanner have the accuracy and quality that Align advertises. *Id.* In the iTero Element sleeve, the glass window is secured in place with a bracket. *Id.* ¶ 16. In use, the sleeve "clicks" into place over the wand, indicating to the user that the sleeve is in place, and ensuring a secure and safe fit and grip. *Id.* This correct positioning also ensures a precise scan. *Id.*

An inferior quality sleeve may affect the performance of the iTero Element scanner system as a whole and may also increase risk to patients in cross-contamination, fluid transfer, discomfort and inconvenience. *Id.* ¶ 17.

### 2. Align's Goodwill

Align's innovative products and services, including specifically the iTero Element scanner, have generated customer goodwill and industry recognition. For example, in December 2018, Align's iTero Element 2 intraoral scanner was awarded a DrBiscupid.com Dental Excellence Award for Best New Diagnostic & Imaging Device 2018. Joshua Rayes Declaration ("Rayes Decl.") ¶ 7, Ex. F, ECF No. 22-6. Align's iTero Element scanners were also winners of the prestigious 2018 Good Design Award from the Chicago Athenaeum Museum of Architecture and Design and The European Centre for Architecture Art Design and Urban Studies. *Id.* ¶¶ 7-9, Exs. F-H.

### 3. Align's Registered Trademarks

Align owns multiple U.S. Trademark registrations, including registrations for iTero (Registration Nos. 4941492, 4926817, and 3687585), iTero Element (Registration No. 4838523), and Invisalign (Registration Nos. 4025403, 3191195, 3060471, 3911988, 3418121), all generally for use in connection with dental services, dental and oral healthcare devices, and computer-aided modeling. Rayes Decl., ¶ 3, Ex. B. One of the Invisalign marks (No. 3911988) consists of a sunburst design and the word "Invisalign." The other marks consist of standard characters without claim to any particular font, style, size or color.

Align uses its iTero, iTero Element, and Invisalign marks together to represent its brand, and announced in July 2017 that it would unify Align's company brands under one brand identity that includes both the Invisalign and iTero brands. *Id.* ¶ 4, Ex. C. Align has never authorized or

approved Strauss's use of Align's name, images or trademarks, nor has Align sponsored or endorsed Strauss's MagicSleeve. Kopelman Decl. ¶ 38.

**B.    Strauss**

Strauss sells dental instruments and related goods. Declaration of Lital Lizotte ("Lizotte Decl.") ¶ 4, ECF No. 44-7. It has nine employees. *Id.* One of its products is the MagicSleeve. *Id.* ¶ 5. The MagicSleeve is a silicone sleeve that covers the wand portion of intraoral scanners. *Id.* It is similar in appearance to the iTero Element sleeve but has some differences. For example, it is reusable, Kopelman Decl. ¶ 20, the glass window in the sleeve is removable and does not have a secure connection to the sleeve, *id.* ¶ 23, and the window in the MagicSleeve does not have antireflective coating and is thicker than the iTero Element sleeve's window. *Id.* ¶ 26.

Strauss began selling its MagicSleeve in August 2018. Lizotte Decl. ¶ 5. Strauss publicly advertises the MagicSleeve to the same target customers that purchase Align's iTero sleeves, and Strauss ships the MagicSleeve through interstate commerce, including from Florida to San Jose, California. Kopelman Decl. ¶ 39. Strauss advertises the MagicSleeve through its website and social media platforms. Ex. O, ECF No. 22-15; Ex. P, ECF No. 22-16; Ex. Q, ECF No. 22-17.

Strauss has sold approximately $450,000 in MagicSleeves in the approximately six months that they have been offered (an average of about $75,000 per month), and Strauss expects this revenue stream to continue in the near future at levels at least at or near that same amount. Lizotte Decl., ¶ 9.

**C.    The Advertisements at Issue**

The advertisements at issue in this motion are Exhibits O, P, Q and R to the Rayes Declaration, ECF No. 22. Exhibit O is a copy of screenshots from Strauss's Facebook page, Exhibit P is a copy of screenshots from Strauss's LinkedIn page, Exhibit Q is a copy of screenshots from Strauss's Instagram page, and Exhibit R is a copy of screenshots of videos that Strauss uploaded to YouTube. The screenshots at issue are all clearly branded as Strauss's and are advertisements for its MagicSleeve. Align sees four problems with them.

**Problem 1: Hashtags.** Several of the screenshots advertising the MagicSleeve have hashtags visible to the viewer that contain Align's marks. For example, the second page of

Exhibit O (ignoring the cover page that says "Exhibit O") has two pictures that show the MagicSleeve in use with a patient. The text says, "If you are a digital scanner user, be prepared to cut your overhead down. Our brand new MagicSleeve is autoclavable and allows for a faster scanning time. Shop now -> https://straussdiamond.com/product/scanner-sleeve/." Immediately below that text there are five hashtags. The third says "#invisalign," and the fifth says "#itero." Of course, Invisalign and iTero are Align's marks. Align objects to its marks being used in an ad for a competitor's product. Similar uses of Align's marks in hashtags in ads for the MagicSleeve also occur in other places in Exhibits O, P and Q.

**Problem 2: iTero image.** The second page of Exhibit R says "Order Today." To the right is a picture of an Align iTero Element machine with a Strauss MagicSleeve on the wand. But it's more than just a picture of the machine and the MagicSleeve. On the screen of the machine are a stylized image of a row of teeth, and on the upper left is an image of both rows of teeth, and on the bottom left is a picture taken of someone's mouth showing a couple of teeth. Although the images on the screen were added just for this ad, the machine itself has the normal "iTero element" logo in tiny letters on the front of it because that's how an iTero Element machine looks in real life. Beneath the picture of the machine appears "www.straussdiamond.com."

The issue with this iTero image becomes clear in the second page of Exhibit T to the Rayes declaration, which is from Align's website. The image of the iTero Element machine with the stylized pictures on it was actually created by Align, then copied by Strauss, which superimposed an image of its MagicSleeve on top of the wand. Align cries foul play over this.

**Problem 3: "25% faster scanning time."** Some of Align's advertisements state that the MagicSleeve provides for a "25% faster scanning time" (*see* Exhibit P, third page). The parties agree this is untrue.

**Problem 4: "Just as sharp."** Strauss makes various representations that its MagicSleeve produces scans that are just as sharp as the ones produced by using an iTero Element sleeve. For example, page three of Exhibit O states that MagicSleeve will save the customer money "while still getting just as sharp of a scan." Align contends this is untrue.

### III.    LEGAL STANDARD

To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief, (3) the balance of equities tips in the favor of the moving party, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). These factors may be evaluated on a sliding scale, such that a preliminary injunction may be issued when plaintiff demonstrates "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff . . . . assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1132 (9th Cir. 2011). The issuance of a preliminary injunction is in the discretion of the district court. *Indep. Living Ctr. v. Maxwell–Jolly,* 572 F.3d 644, 651 (9th Cir. 2009). The party seeking the injunction bears the burden of proving these elements. *Klein v. City of San Clemente,* 584 F.3d 1196, 1201 (9th Cir. 2009).

### IV.    DISCUSSION

**A.     Likelihood of Success**

**1.        Trademark Infringement**

Align argues that it will be able to prove trademark infringement because it has a protected interest in the iTero, iTero Element and Invisalign marks, and Strauss's use of the marks is likely to cause consumer confusion. The use that Align refers to is Problem 1 (Strauss's use of the #itero, #iteroscanner, #invisalign, and #iteroelement hashtags, which contain Align's registered marks, on social media to describe the MagicSleeve) and Problem 2 (Strauss's use of the iTero image that Strauss copy-pasted from Align's website). Mot. at 14. Strauss argues that Align is unlikely to succeed, primarily because of the nominative fair use defense.

A plaintiff asserting trademark infringement must demonstrate that it "owns a valid mark, and thus a protectable interest" and that the defendant's "use of the mark 'is likely to cause confusion, or to cause mistake, or to deceive.'" *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1196 (9th Cir. 2009) (quoting *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005); *see also* 15 U.S.C. § 1114(1)(a), (b).

United States District Court
Northern District of California

### a.      Protected Ownership Interest

"Registration of a mark is prima facie evidence of the validity of the mark, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in connection with the goods specified in the registration." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (citing 15 U.S.C. § 1115(a)). Align provided multiple U.S. Trademark registrations, including registrations for iTero (Registration Nos. 4941492, 4926817, and 3687585), iTero Element (Registration No. 4838523), and Invisalign (Registration Nos. 4025403, 3191195, 3060471, 3911988, 3418121). Rayes Decl. ¶ 3, Ex. B. This suffices to demonstrate it has registered trademarks. Further, Strauss does not contest this point. "When proof of registration is uncontested, the ownership interest element of a trademark infringement claim is met." *Pom Wonderful*, 775 F.3d at 1124.

### b.      Customer Confusion

"Eight factors, sometimes referred to as the *Sleekcraft* factors, guide the inquiry into whether a defendant's use of a mark is likely to confuse consumers." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.,* 618 F.3d 1025, 1030 (9th Cir. 2010) (citing *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir. 1979)). Those factors are:

> (1) the similarity of the marks; (2) the strength of the plaintiff's mark; (3) the proximity or relatedness of the goods or services; (4) the defendant's intent in selecting the mark; (5) evidence of actual confusion; (6) the marketing channels used; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers of the defendant's product.

*Id*.

However, when a nominative fair use defense is raised, the fair-use analysis replaces the likelihood-of-consumer confusion analysis set forth in *Sleekcraft*. *Playboy Enters., Inc. v. Welles,* 279 F.3d 796, 801 (9th Cir. 2002). In nominative fair use, the defendant uses the trademarked term not to describe its product but to describe the plaintiff's. "[N]ominative use of a mark—where the only word reasonably available to describe a particular thing is pressed into service—lies outside the strictures of trademark law . . . such use is fair because it does not imply

sponsorship or endorsement by the trademark holder." *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 308 (9th Cir. 1992). In that situation, the following test for nominative fair use applies:

> First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*Playboy*, 279 F.3d at 801.

"In cases in which the defendant raises a nominative use defense, the above three-factor test should be applied instead of the test for likelihood of confusion set forth in *Sleekcraft*. The three-factor test better evaluates the likelihood of confusion in nominative use cases." *Id.* "When a defendant uses a trademark nominally, the trademark will be identical to the plaintiff's mark, at least in terms of the words in question. Thus, application of the *Sleekcraft* test, which focuses on the similarity of the mark used by the plaintiff and the defendant, would lead to the incorrect conclusion that virtually all nominative uses are confusing." *Id.* "The three-factor test—with its requirements that the defendant use marks only when no descriptive substitute exists, use no more of the mark than necessary, and do nothing to suggest sponsorship or endorsement by the mark holder—better addresses concerns regarding the likelihood of confusion in nominative use cases." *Id.*

### i. Nominative Fair Use

***Problem 1: Hashtags***

Strauss's use of Align's marks in the hashtags in its ads does not qualify as nominative fair use for two reasons. First, in some cases, Strauss used the marks to refer to its *own* product. *See New Kids*, 971 F.2d at 308 ("where the defendant uses a trademark to describe the plaintiff's product, rather than its own, we hold that a commercial user is entitled to a nominative fair use defense provided he meets the following three requirements . . ."); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1009 (9th Cir. 2001) (defendant was not entitled to the nominative fair use defense when it used a photograph of the plaintiffs in its catalog for the purpose of selling its own

goods rather than in order to refer to the plaintiffs for any purpose). Second, in all cases, Strauss used more of the marks than is reasonably necessary to identify the product. *Playboy*, 279 F.3d at 801.

Consider Exhibit Q as an example. The sixth page has an illustrated nine step set of instructions for how to use the MagicSleeve. Four of the steps depict the MagicSleeve being put on and taken off the wand of an iTero scanner. The right-hand side of the page has several hashtags listed, including #itero, #iteroscanner, #iteroelement and #invisalign (the marks at issue), along with #scannersleeve and #diamondprovider (references to the MagicSleeve and Strauss), and then hashtags about dentistry (e.g., #dentist, #cosmeticdentistry) and attractive teeth (e.g., #straightsmiles, #beautifulsmiles). These hashtags are all collectively being used to promote and describe the MagicSleeve. It is not credible to view the hashtags containing Align's marks as referring to Align's products (the foundational assumption of nominative fair use) and the other hashtags as referring to the MagicSleeve. They are all together references to the MagicSleeve. *See Public Impact, LLC v. Boston Consulting Group, Inc.*, 169 F. Supp. 3d 278, 295 (D.Mass 2016) (use of competitor's mark in social media hashtag "likely" to confuse "even a sophisticated consumer").

Second, even if the hashtags with Align's marks in them were thought to be references to Align's products, the hashtags fail the second prong of the three-part nominative fair use test: the hashtags constitute more use of the marks than is reasonably necessary to identify Strauss's product. The pictures to the left of the hashtags show that the MagicSleeve is meant to be used on the wand of an iTero scanner. The hashtags themselves just indicate a vague association between the term in the hashtag and the MagicSleeve. None of the hashtags are reasonably necessary to identify Strauss's product. In fact, the hashtags do not perform an identification function. For example, #straightsmiles and #beautifulsmiles are not meant to identify the MagicSleeve but to imply that this product is associated with having a beautiful or straight smile. Likewise, #dentist and #cosmeticdentistry are too vague to serve as a useful identifier; rather, they indicate that the MagicSleeve is associated with dentistry. In a similar fashion, the hashtags with Align's marks indicate an association with Align's iTero and Invisalign products. But they don't identify the

MagicSleeve – you can't read the hashtags and figure out that this product is the sleeve that goes on the wand of an iTero scanner. All the reader can glean from the hashtags is an implied association.

The first defect in Strauss's nominative fair use argument – that the hashtags are references to its own product, not Align's – occurs in stronger and weaker forms depending on the ad. For example, the fourth page of Exhibit Q is a closer case. It shows a woman in a dental chair who is having her mouth scanned by someone using an iTero scanner with a MagicSleeve on the wand. The textual sentences that use Align's mark ("If you are an iTero user, be prepared to cut your overhead down. Our brand new scanner sleeve is autoclavable and allows for faster scanning time.") are a classic case of nominative fair use, and Align isn't challenging them. Beneath those textual sentences are the hashtags #itero, #iteroscanner, #scannersleeve, #iteroelement and #orthodontics. Since this is less of a laundry list, and it follows textual sentences that refer to the iTero scanner and the sleeve, one could make the argument that #itero, #iteroscanner and #iteroelement are references to Align's products, #scannersleeve is a reference to Strauss's, and #orthodontics is a reference to the category of products both belong to.

But the hashtags are still a use of Align's marks beyond what is reasonably necessary to identify Strauss's product. To see why, imagine this ad in two versions, one with the challenged hashtags and one without them. Does the version with the hashtags better identify Strauss's product? No. The identification of the product comes from the picture of it being used and the textual sentences quoted above. A global problem in all of Strauss's ads that have hashtags that include Align's marks is that in none of the ads do the hashtags serve any identification function; the use of the marks in the hashtags is never reasonably necessary to identify the MagicSleeve. You would have to imagine a pretty terrible ad for the hashtags to do any identifying – maybe just a picture of the MagicSleeve with no illustration or text explaining what it is for, leaving the viewer to wonder if he should put it on his finger to do the dishes, wear it for protection when sewing, or what other use is contemplated. In that case, perhaps #iteroscanner would make him realize, "oh, this is for my dentist to use on an iTero scanner." But none of the ads are like that.

It is true that in addition to being words that a viewer can read, hashtags also perform a

function.  "A hashtag is a type of metadata tag used on social networks such as Twitter and other microblogging services, allowing users to apply dynamic, user-generated tagging which makes it possible for others to easily find messages with a specific theme or content." https://en.wikipedia.org/wiki/Hashtag.  "Searching for that hashtag will yield each message that has been tagged with it."  *Id*.  Thus, Strauss's hashtags, in addition to implying to the viewer of the ad an association between the MagicSleeve and the terms in the hashtag, will also cause Strauss's ads to come up in response to searches for those terms.  Strauss argues that under *Playboy*'s analysis of metatags, *see* 279 F.3d at 803-04, this means the hashtags are nominative fair use.  However, this Court disagrees.  Metatags function behind the scenes to direct an internet searcher to a webpage, but hashtags are visible to consumers in advertising.  Some of Strauss's hashtags are simply implausible as search terms.  Someone looking for information about how to get straight teeth might search for "adult braces" or "straight teeth," but it is unlikely they would search for #beautifulsmiles or even #straightsmiles.  Focusing on someone's *smile* is a marketing association pushed by Strauss, not an attempt to make Strauss's social media pages come up in response to likely internet searches.  The inclusion of these and other implausible search terms (*see, e.g.,* Ex. Q, page 2:  "#instasmile") confirms that the intended audience of the hashtags is, at least in part, the viewer of the ad, implying association between the MagicSleeve and the terms in the hashtags.

Accordingly, Strauss's use of Align's marks in its hashtags is not nominative fair use.

### Problem 2:  iTero image

The iTero image suffers from a different problem.  The nominative fair use test is applicable because Strauss used the mark to refer to Align's product.  Recall that the image is a picture of an iTero scanner with stylized pictures on the screen and the MagicSleeve superimposed on the wand.  The word "iTero" (the mark at issue) appears on the scanner because *it is an iTero scanner*.  This is like a Volkswagen repair shop putting a picture of a Volkswagen (including the VW logo on the car) in an ad to show what it repairs, or a tv channel using the term "Boston Marathon" to describe the race it is going to broadcast.  *See New Kids*, 971 F.2d at 307-08.  It falls within the realm of nominative fair use because the defendant is using the mark to refer to the plaintiff's product – provided the defendant can then satisfy the three-part test.

The first prong is not a problem because the MagicSleeve is not readily identifiable without some reference to an iTero scanner, and the word "iTero" is itself one of the registered marks. The second prong is satisfied as well. Literally the only reason why the word "iTero" appears in the ad is that Align stamped the word on the front of its iTero scanners. To show what customers use the MagicSleeve with, it is reasonably necessary to either (1) show an iTero scanner, which will have the word "iTero" on it, or (2) not show it visually but state in the ad that the sleeve is for the iTero scanner. In both situations, Strauss must use the word "iTero." The Court acknowledges that there are at least a couple of screen shots in evidence (*e.g.*, Exhibit O, page 3) in which Align's marks do not appear at all, but those isolated examples do not change the Court's conclusion that any effective marketing of Strauss's MagicSleeve has to refer to the sole product it is used with.

But Strauss stumbles on the third prong: "the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *Playboy*, 279 F.3d at 801. Here, the image is a copy-paste from Align's website (with the MagicSleeve added on). And it's not just an image of an iTero scanner. Align created pictures for the screen of the scanner, so the overall image is distinctive. The fact that the same distinctive image, clearly designed for advertising purposes, appears in Strauss's marketing *and* on Align's website suggests association or affiliation. It suggests to a reasonable person that Strauss's MagicSleeve is in some manner endorsed or authorized by Align.

There is nothing inherently wrong with Strauss putting a MagicSleeve on an iTero scanner, taking a picture of that, and using that image in its marketing. That likely would constitute nominative fair use. But when Strauss lifted a stylized image of an iTero scanner from Align's website, it went too far. Align's marketing people created that image, and any reasonable observer would understand it was a picture created for an ad. When it starts showing up in Strauss's ads for the MagicSleeve, reasonable people would infer sponsorship or endorsement by Align.

Accordingly, the iTero image is not nominative fair use.

### ii.     Sleekcraft Factors

Because Strauss's use of the hashtags and the screenshot is not nominative fair use, the

Court must apply the *Sleekcraft* factors.  To repeat, they are:

> (1) [T]he similarity of the marks; (2) the strength of the plaintiff's mark; (3) the proximity or relatedness of the goods or services; (4) the defendant's intent in selecting the mark; (5) evidence of actual confusion; (6) the marketing channels used; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers of the defendant's product.

*Fortune Dynamic,* 618 F.3d at 1030 (citing  *Sleekcraft,* 599 F.2d at 348-49.  These factors are "helpful guideposts . . . not a scorecard, a bean-counter, or a checklist." *Id.* at 1031.  The analysis is not to be considered in a mechanical fashion, and instead the importance of each *Sleekcraft* factor will vary in each particular case.  *Brookfield Communs. Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1055 n.16 (9th Cir. 1999).  A plaintiff need not satisfy all of the *Sleekcraft* factors.  *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014).

### 1. Similarity of the Mark

"We begin by comparing the allegedly infringing mark to the federally registered mark. The similarity of the marks will always be an important factor." *Brookfield*, 174 F.3d at 1054. Here, it is undisputed that Strauss is using Align's registered marks in its online advertising for the MagicSleeve.  The allegedly infringing mark and the registered mark are not merely similar; they are the same. *See Brookfield,* 174 F.3 at 1056 ("In light of the virtual identity of marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course.").  Thus, this factor weighs in Align's favor.

### 2. Strength of the Mark

In considering the strength of a mark, the Court considers the mark's conceptual and commercial strength.  *See M2 Software, Inc., v. Madacy Entm't,* 421 F.3d 1073, 1080-81 (9th Cir. 2005).  "Trademarks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful." *Id.* at 1080 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive." *Two Pesos, Inc.,* 505 U.S. at 768.

The iTero and iTero Element marks are fanciful because they consist of words or "coined phrases" that "have no commonly known connection with the product at hand." *Surfvivor Media,*

*Inc. v. Survivor Prods.,* 406 F.3d 625, 632 (9th Cir. 2005) (citing *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1130 n.7 (9th Cir. 1998)). They are therefore strong marks, regardless of commercial success. *See M2Software*, 421 F.3d at 1081 ("we hold that a lack of commercial strength cannot diminish the overall strength of a conceptually strong mark").

The Invisalign mark is suggestive because it is a combination of the words "invisible" and "align," both of which are connected to the orthodontic product. *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery,* 150 F.3d 1042, 1047 n.8 (9th Cir. 1998) (a suggestive mark is one for which "a consumer must use imagination or any type of multistage reasoning to understand the mark's significance . . . the mark does not *describe* the product's features, but *suggests* them."). While invisible and align are each common terms, it is the mark in its entirety, "invisalign," that must be considered—not simply individual elements of that mark. *See California Cooler Inc. v. Loretto Winery, Ltd.,* 774 F.2d 1451, 1455 (9th Cir. 1985).

Because it is suggestive, the Invisalign mark is "presumptively weak." *Brookfield*, 174 F.3d at 1058. However, commercial success and marketplace recognition "can transform a suggestive mark into a strong mark." *Id.*; *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002). As of December 2018, the number of patients treated with the Invisalign system reached six million. Rayes Decl., Ex. D. The product and mark have broad global reach as there are over 150,000 Invisalign trained doctors worldwide. *Id.* In the United States, Invisalign is a popular, well known product. It is a household name. It is therefore a strong mark.

Accordingly, the strength of the marks weighs in Align's favor.

### 3. Proximity of the Goods

Next, the Court considers the proximity of the goods. The party seeking a preliminary injunction "need not establish that the parties are direct competitors to satisfy the proximity or relatedness factor. Related goods (or services) are those 'which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'" *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190 1212 (2012) (quoting *Sleekcraft*, 599 F.2d at 348 n.10). A court may consider the parties to be competitors if

14

they sell goods in the same industry or if their goods are complementary.  *See id.*  In this instance, the MagicSleeve is an iTero compatible product and meant to be a replacement for the iTero sleeve produced by Align.  Therefore, the parties are direct competitors, and this factor, too, weighs in Align's favor.

### 4.  The Defendant's Intent in Selecting the Mark

"The law has long been established that if an infringer adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities."  *Brookfield,* 174 F.3d at 1059 (internal quotation marks and citations omitted); *see also Playboy Enterprises,* 354 F.3d at 1028 ("A defendant's intent to confuse constitutes probative evidence of likely confusion: courts assume that the defendant's intentions were carried out successfully.").  "This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark."  *Brookfield,* 174 F.3d at 1059 (citing *Official Airline Guides,* 6 F.3d at 1394; *Fleischmann Distilling,* 314 F.2d 149 at 157).

Here, Strauss obviously had knowledge that iTero, iTero Element and Invisalign were Align's marks.  The MagicSleeve is intended to be used with the iTero element, and Strauss knows that product and the names associated with it belong to Align.  There is also some evidence that Strauss used Align's marks to derive benefit from Align's reputation and good will.  When asked why Strauss "include[s] the iTero, iTero Element, and Invisalign hashtags in its Instagram post," Strauss's Vice President Lital Lizotte testified:  "Most likely because it has a high following."  ECF No. 59-7 at 30:22-25.

Accordingly, this factor favors Align.

### 5.  Evidence of actual confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely."  *Sleekcraft*, 599 F.2d at 352.  "Proving actual confusion is difficult, however."  *Id*.  "Because of the difficulty in garnering such evidence, the failure to prove instances of actual confusion is not dispositive."  *Id*. at 353.  While evidence of actual of confusion is not dispositive because of the difficulty of gathering this evidence, this factor is weighed heavily when

15

such evidence exists. *See Macy's, Inc. v. Strategic Marks, LLC*, Nos. 11-cv-06198-EMC, 15-cv-00612-EMC, 2016 WL 374147, at *7 (N.D. Cal. Feb. 1, 2016) (quoting *Sleekcraft*, 599 F.2d at 352-53). Common sense suggests that "if enough people have been actually confused, then a likelihood that people are confused is established." *Thane Int'l, Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 902 (9th Cir. 2002) (original emphasis omitted). Consequently, "[e]vidence of actual confusion constitutes persuasive proof that future confusion is likely." *Id.* (quoting *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1265 (9th Cir. 2001)) (internal quotation marks omitted).

Align has submitted some anecdotal evidence of actual confusion. The Declaration of Jacqueline Abreu, a clinical trainer for Align, states that one dentist told her he "did not know that Align did not approve of the use of Strauss Diamond's MagicSleeves with Align's iTero system" and, in a second instance, that it was her "understanding that this dentist did not know that the MagicSleeves are not an Align sponsored product." Abreu Decl., ECF No. 21-2, ¶¶ 5, 9. Susan Damron, another clinical trainer for Align, states in her declaration that it was her understanding that a dentist who called Align to complain about the performance of an iTero Element being used with a Strauss MagicSleeve believed the MagicSleeves "to be Align-supported products." Damron Decl. ¶ 5.

However, because this evidence is anecdotal, it is entitled to little weight. Accordingly, this factor is neutral.

### 6 and 7. Marketing channels used and likelihood of expansion into other markets

Align argues the next two factors, (1) the marketing channels used and (2) the likelihood of expansion into other markets, are neutral because "the overlap between consumers viewing their respective websites and social media pages is unknown. And where, as here, the parties are already positioned to compete, the expansion of products or services factor becomes unimportant." Mot. at 18; *see Brookfield*, 174 F.3d at 1060. Strauss does not respond. Accordingly, the Court will deem these factors neutral.

### 8. Degree of care

Finally, the Court considers the type of good and the degree of care likely to be exercised by purchasers. The lower the customer care the greater the likelihood of confusion. *Network Automation*, 638 F.3d at 1152 (citing *Playboy Enterprises, Inc.,* 354 F.3d at 1028). "Consumer care for inexpensive products is expected to be quite low." *Playboy*, 354 F.3d at 1028. Here, the cost of the MagicSleeve is $360 for one pack of fifteen sleeves. ECF No. 66-3 at 13. This is low cost as it is $24 a unit, similar to the cost $20 cost per unit in *La Terra Fina USA, LLC v. TerraFina, LLC*, which the court found was low and thus, "consumers are not expected to be taking great care in analyzing the products' packaging." No. 17-CV-03613 NC, 2017 WL 4284167, at *5 (N.D. Cal. Sept. 27, 2017).

However, the cost of a product is not the only factor to be considered. The sophistication of the consumer should be considered as well. "Likelihood of confusion is determined on the basis of a 'reasonably prudent consumer.' What is expected of this reasonably prudent consumer depends on the circumstances. We expect him to be more discerning—and less easily confused—when he is purchasing expensive items, and when the products being sold are marketed primarily to expert buyers." *Brookfield,* 174 F.3d at 1060 (citations omitted). Here, the product is tailored for a highly specialized group of buyers: orthodontists. There is no evidence before the Court concerning who in a dentist's office normally makes the purchasing decision for a MagicSleeve as opposed to an iTero sleeve, i.e., whether it is the dentist or someone else. Nonetheless, it is someone with specialized knowledge about dental equipment well beyond what the average person would know.

Accordingly, the Court finds this factor to be neutral, as the cost of the item and the sophisticated nature of the customers point in different directions.

### 9. Conclusion

For reasons similar to why the Court rejects Strauss's nominative fair use defense, the Court also finds that the totality of the *Sleekcraft* factors weigh in favor of finding likelihood of confusion. The use of Align's marks in Strauss's hashtags and the use of the iTero mark in an image copied from Align's website imply association. Align's marks are strong, and Strauss used

them to advertise its competing, nearly identical product. *See Brookfield*, 174 F.3d at 1056 ("In light of the virtual identity of marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course."). Further, Strauss knew it was using its competitor's marks. Under the circumstances, a reasonable person would be confused into thinking that Align has endorsed or sponsored, or given its approval or authorization for, the MagicSleeve. That type of implied endorsement from the makers of Invisalign would have high value for purchasers of the MagicSleeve, but it is untrue. In reality, there is no such endorsement. Accordingly, Align is likely to prevail on the merits of its trademark infringement claim.

### 2. Trademark Counterfeiting

Align argues it can prove trademark counterfeiting by demonstrating that Strauss is using counterfeits of its marks to sell the MagicSleeve. Strauss argues that none of Align's registrations cover protective or disposable sleeves used on its scanners and, also, that the sleeves (MagicSleeve and iTero) themselves are not similar. Opp. to Mot. at 13.

"A trademark is counterfeited if the defendant, without authorization from the trademark owner, uses an original mark or a copy of a mark in connection with the sale of goods." *H-D Michigan Inc. v. Biker's Dream Inc.,* No. CV 97-864 SVW (CWX), 1998 WL 697898, at *3 (C.D. Cal. July 28, 1998) (citing *Westinghouse Electric Corp. v. General Circuit Breaker & Electric Supply Inc. et al.,* 106 F.3d 894, 899 (9th Cir. 1997), *aff'd in part, appeal dismissed in part,* 230 F.3d 1366 (9th Cir. 2000)). A counterfeit "is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.

Align has not carried its burden to show that it is likely to succeed on the merits of its counterfeiting claim. First, "[t]he definition of 'counterfeit' reaches only cases in which the counterfeit mark is used in connection with the same goods and services as those for which the mark is registered on the Principal Register and is in use." *Ford Motor Co. v. O.E. Wheel Distributors, LLC*, 868 F. Supp. 2d 1350, 1371 (M.D. Fl. 2012) (citing *State of Idaho Potato Com'n v. G&T Terminal Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005)). Strauss argues that Align's marks do not cover scanner sleeves, quoting the iTero registration No. 3,687,585. The Court's own review of all of the registrations submitted in connection with the preliminary

injunction motion leads it to the preliminary conclusion that none of the marks cover sleeves. Align has a conclusory footnote in its reply brief (ECF No. 59-3 at 9 n.3), asserting without explanation that its registrations cover scanner sleeves. However, that footnote provides no assistance.

Second, "counterfeiting is the 'hard core' or 'first degree' of trademark infringement that seeks to trick the consumer into believing he or she is getting the genuine article, rather than a 'colorable imitation.'" *Gucci Am., Inc. v. Guess?, Inc.,* 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012) (citation omitted). "For this reason, courts have uniformly applied this provision to products that are stitch-for-stitch copies of those of another brand." *Id*. Here, the shape, color, and design of the MagicSleeve are different from the iTero sleeve. The MagicSleeve has a fin on the back and no grips on the side, *see* Rayes Decl., Ex. O, unlike the iTero sleeve. The MagicSleeve is also light blue, whereas the iTero sleeve is white. In its motion, Align has an image of the MagicSleeve lying on its side (so you can't see the fin that distinguishes it from the iTero sleeve) lined up next to the dark blue iTero protective sleeve, apparently to show they are just different shades of blue. ECF No. 21, page 6. In addition to hiding the fin this way, the comparison between the MagicSleeve and the iTero protective sleeve that stays on the iTero wand when the machine is not in use is spurious because the blue MagicSleeve is an alternative to the white iTero *disposable* sleeve, not the protective sleeve. In short, the MagicSleeve is not a stitch-for-stitch copy.

Accordingly, Align is not likely to prevail on its trademark counterfeiting claim.

### 3. False Association

Align argues that it will prevail on its false association claim because the evidence demonstrates that Strauss uses in commerce words, false designations of origin, false or misleading descriptions, or representations of fact, which are likely to cause confusion or misrepresent the characteristics of Strauss's goods or services. Mot. at 11. Additionally, Align argues that Strauss's advertisements are intended to, and have, misled consumers into believing that Align endorses or authorizes the sale of, or otherwise is affiliated with, the MagicSleeve. Mot. at 12. Strauss argues that Align is misguided in making a false association claim because a

"false association claim typically involves infringement of an unregistered mark." Opp. to Mot. at 11.[1]

To succeed on its false association claim under 15 U.S.C. § 1125(a)(1)(A), Align will have to prove that Strauss "(1) use[d] in commerce (2) any word, false designation of origin, false or misleading description, or representation of fact, which (3) is likely to cause confusion or misrepresents the characteristics of [its] goods or services." *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902 (9th Cir. 2007). Here, Strauss's advertising the MagicSleeve on Facebook, Instagram, LinkedIn and YouTube constitutes use in commerce because "the Internet is an instrumentality and channel of interstate commerce." *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) (quoting *United States v. Trotter,* 478 F.3d 918, 921 (8th Cir. 2007) (per curiam)).

Align's false association arguments are no different from its trademark claim. Align argues that the iTero image taken from its website and altered to add the MagicSleeve and the hashtags used in Strauss's ads that contain Align's marks cause customers to be confused into thinking Align endorses or is in some way associated with the MagicSleeve. For the reasons previously discussed, the Court finds that Align is likely to prevail on this claim.

### 4. False Advertising

Align also argues that it is likely to succeed on its false advertising claim because Strauss's advertisements are "literally false." Mot. at 12. Align cites to two examples of "literally false" statements: Problem 3 (Strauss's statement that the MagicSleeve provides "25% faster scanning time") and Problem 4 (Strauss's statement that its MagicSleeve provides "just as sharp of a scan" as Align's iTero scanner sleeve). Mot. at 12-13.[2]

The elements of a Lanham Act false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement

---

[1] Strauss cites 5 McCarthy on Trademarks and Unfair Competition § 27:14 for this proposition. In fact, that section of McCarthy states that section 43(a) of the Lanham Act "provides a federal vehicle for assertion of infringement of *even* unregistered marks and trade names" (emphasis altered), not *only* for unregistered marks and trade names.

[2] Align argues that Strauss's advertisements "are also literally false by implication, by suggesting that the MagicSleeve product is somehow endorsed or sponsored by Align." Mot. at 13. However, that is duplicative of Align's false association claim asserted under the same section of the Lanham Act.

actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir. 1997).

### a. False statement

When asserting a false advertising claim under the Lanham Act, a plaintiff may establish the "falsity" of the advertisement in one of two ways. *Southland Sod Farms,* 108 F.3d at 1139. A "plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Id.*

Here, Strauss conceded at oral argument that its statement that the MagicSleeve provides a 25% faster scanning time is literally false.

However, Strauss's statement that its MagicSleeve provides "just as sharp of a scan" is harder. Align has submitted persuasive evidence that the MagicSleeve will often produce a lower quality scan. The design of the MagicSleeve means that the window is more likely to be out of place because it is not attached to the sleeve and the sleeve does not "click" into place. The MagicSleeve was not tested for leakage before it was sold. The complicated cleaning instructions are likely to result in blurry screens. Align has submitted a large number of customer complaints about the quality of the scans taken with the MagicSleeve. All of this evidence persuades the Court that the MagicSleeve often results in scans that are less sharp than those taken with the iTero sleeve. Given the considerable investment that Align made into the quality of its own products, it is understandable that Align filed this lawsuit and brought this motion to end the association of the MagicSleeve that is implied by Strauss's ads.

However, there is no evidence before the Court concerning exactly how often the MagicSleeve produces a lower quality scan. To put a finer point on it, there is no evidence concerning whether the MagicSleeve results in a lower quality scan *most of the time*. Even if it

results in a lower quality scan often enough to be a headache for Align to be associated with it – and Align has established that – it does not follow that Strauss's statement that its product provides "just as sharp of a scan" is always or even usually false.

Based on the record now before the Court on this preliminary injunction motion, Align has not proven that Strauss's statement that the MagicSleeve produces "just as sharp of a scan" is false.

### b.    Other elements

With respect to the false advertisement that the MagicSleeve provides a 25% faster scanning time, Align is likely to succeed in proving the remaining elements of its claim. The publication of a deliberately false statement gives rise to a presumption of actual deception and materiality. *See U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040-41 (9th Cir. 1986). Strauss's assertion that the MagicSleeve provides a 25% faster scanning time appears to have been entirely made up out of nothing. In this lawsuit the company offers no defense or explanation for the statement. The Court infers that it is deliberately false. As discussd above, the statement was made on the internet so was in interstate commerce. And Align is likely to be injured by this false statement in the form of the direct diversion of sales (because the MagicSleeve is an alternative to purchasing iTero sleeves) and the lessening of goodwill from this untrue claim that its competitor's product produces scans significantly faster.

Accordingly, Align is likely to succeed on this portion of its false advertising claim.

### 5.    State Law Unfair Competition and False Advertising

Align argues it is also likely to succeed on its state law unfair competition and false advertising claims because it has demonstrated that it is likely to succeed on its federal false advertising and trademark infringement claims. Align argues that courts have "recognized that any violation of the false advertising law . . . necessarily violates the UCL," and the "laws prohibit not only advertising which is false, but also advertising which although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." Mot. at 18-19 (quoting *Kasky v. Nike*, Inc. 27 Cal. 4th 939, 951 (2002) (internal quotations marks, alterations, and citations omitted)). Strauss does not dispute that violations of federal law

1    establish violations of these state laws.  Rather, Strauss incorporates by reference its arguments

2    that it did not violate federal law.

3          A claim under California's unfair competition law exists upon a showing of "any unlawful,

4    unfair or fraudulent business act or practice [or any] unfair, deceptive, untrue or misleading

5    advertising," which includes claims of false advertising and false association.  Cal. Bus. Prof.

6    Code § 17200.  Here, Align is likely to prevail on its unfair competition claim under the

7    "unlawful" prong because, as discussed above, it is likely to prevail on its Lanham Act claims for

8    trademark infringement, false association and false advertising.  *See, e.g., Phillip Morris USA Inc.*

9    *v. Shalabi,* 352 F. Supp. 2d 1067, 1072 (C.D. Cal. 2004) (holding that liability for federal

10   trademark infringement is sufficient to establish liability for unfair competition under § 17200);

11   *Kalologie Franchising LLC v. Kalologie Skincare Med. Grp. of California,* No. CV 14-00016

12   DDP VBKX, 2014 WL 953442, at *5 (C.D. Cal. Mar. 11, 2014) (same).

13         California's false advertising law make it "unlawful for any person . . . to make or

14   disseminate . . . before the public in this state [or] from this state before the public in any state . . .

15   any advertising device . . . or in any other manner or means whatever, including over the

16   Internet, any statement . . . which is untrue or misleading . . ."  Cal. Bus. & Prof. Code § 17500.

17   Align is likely to prevail on this claim because it is likely to prevail on its similar federal claims.

18   *See Cairns v. Franklin Minto Co.*, 24 F. Supp. 2d 1013, 1037 (C.D. Cal. 1998) (holding that

19   Lanham Act claims for false advertising and false designation of origin establish liability under §

20   17500).

21   **B.    Irreparable Harm**

22         Align argues that it has and will continue to suffer irreparable harm absent a preliminary

23   injunction because Strauss's acts impugn Align's stellar reputation and lessen the goodwill that

24   Align has built through significant investment and quality products.  Mot. at 20.  Furthermore,

25   according to Align, these losses cannot be compensated with monetary relief because Strauss's

26   continued use of Align's registered trademarks will allegedly result in Align losing control over its

27   reputation and goodwill.  *Id.*  Strauss argues that Align's suggestion that consumers will ascribe to

28   Align problems with a product that they knowingly bought from Strauss is entirely speculative and

doesn't meet the requisite showing of concrete evidence that Align will be harmed absent injunctive relief.

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). The mere possibility of irreparable harm is not enough to justify a preliminary injunction. As the Supreme Court made clear in *Winter*, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." 555 U.S. at 22; *see also Alliance*, 632 F.3d at 1131 ("Under *Winter*, plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.") (emphasis omitted). The threat of irreparable harm must also be "immediate" to warrant preliminary injunctive relief. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). "Speculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007).

The Court has found that Align is likely to succeed on its trademark infringement claim because Strauss's use of Align's marks implies association or approval. This means that dental professionals and patients are likely to believe that the MagicSleeve is somehow endorsed or approved by Align, when it is not. Align has no control over Strauss's MagicSleeve and Strauss's continued use of Align's marks will result in Align losing control over its reputation and goodwill as a result. This is irreparable harm that cannot be compensated for with monetary relief because "one of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *State of Idaho Potato Comm'n*, 425 F.3d at 721 (quoting *El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986)).

In addition, Align has submitted evidence establishing the inferior quality of the

MagicSleeve and that many customers have complained about its poor quality.  *See, e.g.*, Rayes Decl., ECF No. 66-3 (collecting complaints).  This too establishes irreparable harm  because there is "a significant risk of irreparable harm to Plaintiff's reputation and goodwill if a customer becomes dissatisfied with Defendants' service, but aims that dissatisfaction toward Plaintiff instead of Defendants."  *Diller v. Barry Driller, Inc.*, No. CV 12-7200 ABC EX, 2012 WL 4044732, at *9 (C.D. Cal. Sept. 10, 2012); *see also Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.,* 156 F. Supp. 3d 1173, 1185 (E.D. Cal. 2016) (granting preliminary injunction where defendant's use of plaintiff's trademark "will cause Plaintiff to lose its ability to control its brand reputation and goodwill, since what could be perceived by consumers as the quality of Plaintiff's product risks no longer being within Plaintiff's control").

This risk is heightened here because iTero and iTero Element are fanciful marks, and Invisalign is a strong and famous mark, so Strauss's use of them almost automatically tells a customer they refer to a brand.  *See Qualitex v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 162-63 (1995) (observing that fanciful, arbitrary or suggestive words or designs almost automatically tell a customer that they refer to a brand).  Even Strauss's Vice President essentially admitted that Strauss used Align's marks to capitalize on their much greater fame, which is another indicator that customers will associate those marks with Align.  Further, any continued false advertising that the MagicSleeve produces scans 25% faster than the iTero sleeve is simply an untrue swipe at Align's reputation and goodwill among its customers.

Accordingly, Align has shown that it will suffer irreparable harm absent a preliminary injunction.

## C.     Balance of Equities

Align argues it is suffering serious harm due to Strauss's unlawful conduct, not just based on the lost sales of additional iTero sleeves, but also because of the poor performance of the MagicSleeve, which consumers are likely to attribute to Align's iTero Element scanner.  Reply to Opp. at 14.  Strauss argues that Align is unlikely to win on the merits.  Strauss also argues that the injunction Align seeks would do more than halt the alleged infringement and false advertising because Align asks the Court to completely enjoin any advertising or sale of the MagicSleeve,

which would impose hardship on Strauss.

Both sides make good points. Align is likely to prevail on most of its claims on the merits, and it has made a strong showing of irreparable harm. Thus, the balance of the equities favors a preliminary injunction against continued trademark infringement, false association and false advertising. However, Align offers no reason why the Court should enjoin the sale of the MagicSleeve, as well as any and all advertising of it. It's not like Strauss imprinted Align's marks directly on the MagicSleeve. The marks and the false advertising just appear in the advertising. To completely enjoin Strauss from advertising or selling the MagicSleeve would be an unwarranted remedy that would unfairly stifle competition.

### D. Public Interest

The Court has found that Align is likely to prevail on its claims for trademark infringement, false association and false advertising. "The public interest underlying the Lanham Act's prohibition of misleading advertisement is that of preventing consumer confusion or deception." *Hall v. Bed Bath & Beyond, Inc.,* 705 F.3d 1357, 1367 (Fed. Cir. 2013) (quoting *Conopco, Inc., v. Campbell Soup Co.,* 95 F.3d 187, 193 (2d Cir. 1996)). "An injunction that prevents consumer confusion in trademark cases . . . serves the public interest." *American. Rena Int'l Corp. v. SisJoyce Int'l Co. Ltd.,* 534 Fed. Appx 633, 636 (9th Cir. 2013) (affirming preliminary injunction).

### E. Mootness

Strauss argues that Align's motion for a preliminary injunction is moot because Strauss has ceased the conduct challenged in the motion. Its Vice President submitted a declaration stating that the company removed all online ads that reference faster scanning times "in part to accommodate Plaintiff's concerns, and has since refrained from making similar claims, and has no intention of resuming such ads." Declaration of Lital Lizotte ("Lizotte Decl.") ¶ 7; Opp. at 15. She also testified in her February 22, 2019 deposition that Strauss removed all references to Align's marks from its advertising in the month before her deposition, Keeley Vega Decl., Ex. 1, ECF No. 59-7, which was after this lawsuit was filed and around the time Align filed this motion.

"Under the voluntary cessation exception [to the mootness doctrine], a defendant's

decision to stop a challenged practice generally does not deprive a federal court of its power to determine the legality of the practice." *Akina v. Hawaii*, 835 F.3d 1003, 1010 (9th Cir. 2016) (per curiam) (citation and quotation marks omitted). "[A]n action for an injunction does not become moot merely because the conduct complained of was terminated, if there is a possibility of recurrence, since otherwise the defendants would be free to return to their old ways." *F.T.C. v. Affordable Media,* 179 F.3d 1228, 1237 (9th Cir. 1999) (citations, emphasis and quotation marks omitted). "Voluntary cessation of challenged conduct moots a case only if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,'" *Adarand Constructors, Inc. v. Slater,* 528 U.S. 216, 222 (2000) (quoting *United States v. Concentrated Phosphate Export Assn., Inc.,* 393 U.S. 199, 203 (1968)).

Strauss has not met its "heavy burden" of persuading the court that "the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 189 (2000). Strauss ceased engaging in the challenged conduct only after it was sued and not even immediately then. There is no reason to think it will not start up the same behavior again absent an injunction. *See Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135-36 (9th Cir. 1986) ("The defendants refused to stop violating those rights until Polo brought suit in federal district court. We should not require Polo also to introduce concrete evidence that the defendants are likely to infringe again. If the defendants sincerely intend not to infringe, the injunction harms them little; if they do, it gives Polo substantial protection of its trademark.").

## F.    Security

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Rule 65(c) invests the district court "with discretion as to the amount of security required, *if any.*" *Barahona–Gomez v. Reno,* 167 F.3d 1228, 1237 (9th Cir. 1999) (emphasis added) (citing *Doctor's Assoc., Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir. 1996)). The district court may dispense with the filing of a bond when it

concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct. *Id.* Given Strauss's own representations that it has ceased the challenged conduct, the issuance of a preliminary injunction will not impose any additional cost on Strauss. Accordingly, the Court determines that no bond is necessary.

### V. CONCLUSION

Align's motion for a preliminary injunction is **GRANTED IN PART** and **DENIED IN PART**. The Court **ORDERS** that Strauss Diamond Instruments, Inc., and its officers, agents, servants, employees, and anyone in active concert or participation with them are **ENJOINED** from: (1) infringing Align's registered marks for iTero, iTero Element or Invisalign; and (2) disseminating, publishing, or causing to be made available to the public the statement that the MagicSleeve provides a "25% faster scanning time" than Align's iTero scanning sleeve.

**IT IS SO ORDERED.**

Dated: April 12, 2019

THOMAS S. HIXSON
United States Magistrate Judge